IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| OMNI HEALTH SOLUTIONS, LLC, *Plaintiff*, v. ZURICH AMERICAN INSURANCE COMPANY, *Defendant*. | CIVIL ACTION NO. 5:17-cv-00168-TES |

### ORDER GRANTING DEFENDANT'S
### MOTION FOR PROTECTIVE ORDER IN PART

This case is before the Court on Defendant's Motion for Protective Order [Doc. 25], which, as explained below, is **GRANTED IN PART**.

### FACTUAL BACKGROUND

This case arises from alleged hail damage at Plaintiff's location in Macon, Georgia, on February 14, 2011. [Doc. 1-2, ¶ 5]. Plaintiff claims that it immediately notified Defendant, its insurance company, of the damage, but Defendant's claims adjuster, Michael Ferunden, did not inspect the property until over a month after Plaintiff notified Defendant of the claim. [*Id.* at ¶ 6]. After Mr. Ferunden visited the property, he verbally denied Plaintiff's claim and told Plaintiff he did not observe any storm-related damage to the roof. [*Id.* at ¶ 7; Doc. 25-1, pp. 9-10, File Note dated 2/17/11 at 5:33 AM].

Plaintiff disagreed with Mr. Ferunden's assessment and retained his own engineer in late February 2011 to inspect the property and make a report of the damage. [Doc. 1-2, ¶ 8; Doc. 25-2]. In his report, Plaintiff's engineer provided his professional opinion that the roof had been damaged by hail. [Doc. 25-2, p. 2]. In response, Defendant sent an independent engineer to reinspect the property in early March 2011. [Doc. 25-1, p. 11, File Note dated 3/4/11 at 10:49 AM]. The independent engineer (Raymond Ramos) inspected the property on March 11, 2011, and concluded that the damage to the roof was caused by poor installation rather than hail. [*Id.* at pp. 12-13, File Direction dated 3/23/11 at 2:30 PM; Doc. 25-3; Doc. 25-4]. Plaintiff continued to contest the cause of the roof damage until September or October 2011, when Mr. Ferunden met with two of Plaintiff's engineers and acknowledged the roof was damaged by hail and covered by the policy. [Doc. 25-7; Doc. 25-1, p. 16, File Note dated 10/10/11 at 7:21 AM].

Plaintiff claims that the delay between the initial damage (February 2011) and the official coverage decision (September 2011) caused more damage to the property and caused Plaintiff to incur further expenses. [Doc. 1-2, ¶ 14]. On January 12, 2012, presumably dissatisfied with the Defendant's assessment of the amount of the loss, Plaintiff invoked his right to an appraisal under the following provision of the policy:

> B.  **Appraisal** – If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the

> value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire, A decision agreed to by any two will be binding. Each party will:
> 1. Pay its chosen appraiser; and
> 2. Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we will still retain our right to deny the claim.

[Doc. 1-2, p. 48; Doc. 25-11].

The appraisers made a structural award of $886,795.57 on the claim, but Plaintiff claims Defendant unjustifiably withheld $337,424.35 of the award. [Doc. 25-14; Doc. 1-2, ¶¶ 15, 16]. As a result, Plaintiff brought the instant lawsuit, alleging that Defendant breached the insurance policy by (1) failing to make a coverage decision within 30 days of receiving proof of loss, (2) failing to pay Plaintiff the full amount of the structured appraisal award for the loss, and (3) failing to assess the diminished value of Plaintiff's property and failing to pay the diminished value. [Doc. 1-2; Doc. 18]. Plaintiff also claims that Defendant acted in bad faith by failing to comply with the terms of the policy. [Doc. 1-2].

## **PROCEDURAL HISTORY**

During the course of this litigation, Plaintiff asked Defendant to "[i]dentify all documents created by each of Zurich's agents in adjusting or inspecting the property" and requested "[c]opies of all adjuster logs, internal communications, taped or recorded statements, engineering reports, and other documents and records relating to the Property." [Doc. 25-28, pp. 5, 7]. In response to both requests, Defendant noted that it is

3

"in possession of its claims notes, which are not being produced herewith." [*Id.* at pp. 6, 7].

Approximately eight months after Defendant responded to Plaintiff's requests, Plaintiff sent a letter to Defendant contesting the discoverability of Plaintiff's claims notes. [Doc. 25-29]. In the letter, Plaintiff's counsel contends that there is information contained in the claims notes that is relevant to this case and that the claims notes are protected by neither the attorney-client privilege nor the work-product doctrine. [*Id.*]. Plaintiff then warned Defendant that failure to produce the claims notes in response to the letter would force Plaintiff to seek the Court's intervention. [*Id.* at p. 2].

The Court held a telephone conference on April 16, 2018, to discuss the issue of the claims notes. [Doc. 23]. During the conference, the Court encouraged the parties to resolve this issue without the Court's intervention and directed Defendant to provide a more detailed privilege log listing its reasons for believing the individual claims notes to be protected. In accordance with this directive, Defendant submitted a revised privilege log [Doc. 28] and produced two sets of claims notes containing a total of 118 entries from February 15, 2011 to March 28, 2011, and from October 10, 2011 to November 2, 2011 [Doc. 25-1].

Defendant now moves the Court, in light of the letter, for a protective order declaring the remaining unproduced claims notes protected by the work-product doctrine. Plaintiff opposes the motion, arguing that some—if not all—of the claims notes

4

were created in the ordinary course of business and not in anticipation of litigation. The Court conducted an *in camera* review of over 1,500 pages of Defendant's claims notes and finds as follows.

## DISCUSSION

### A. Standard of Review

The text of Federal Rule of Civil Procedure 26(c) allows the Court, within its discretion, to "issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" upon the party or person's showing of "good cause." Fed. R. Civ. P. 26(c)(1). Federal courts, including those in the Eleventh Circuit, impose a balancing test in order to determine good cause. *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313 (11th Cir. 2001) (citing *Farnsworth v. Procter & Gamble, Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985)). When applying this test, a district court must "balance the party's interest in obtaining access against the other party's interest in keeping the information confidential." *Id.*

Rule 26 also protects documents that are "prepared in anticipation of litigation or for trial by or for another party or its representatives." Fed. R. Civ. P. 26(b)(3)(A). When a party asserts that the sought-after information is protected by this work product doctrine, the requesting party must show that the documents are within the scope of discovery under Rule 26(b)(1) and "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent

5

by other means." *Id.* Even if the requesting party makes such a showing, the party seeking protection will not be required to produce documents that contain "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

Defendant argues that its claims notes are protected by the work product doctrine. Therefore, the Court must first determine whether (and which of) Defendant's claims notes were prepared in anticipation of litigation. If any of the claims notes were prepared in anticipation of litigation, the Court must then determine whether Plaintiff has a substantial need for those claims notes and cannot, without undue hardship, obtain the information within those documents from some other source. If so, the Court must finally determine which claims notes—if any—contain mental impressions, conclusions, opinions, or legal theories, all of which are undiscoverable.

### B. Anticipation of Litigation

The parties' preeminent argument concerns the meaning of "anticipation of litigation" in the context of first-party insurance disputes. Defendant argues, in essence, that claims notes created in "anticipation of litigation" are those that were created after the point when Zurich subjectively perceived a strong possibility of litigation. Plaintiff, on the other hand, essentially argues that the only notes that were prepared in anticipation of litigation are those that were created *because of* the litigation; that is, the

only protected claims notes are those that would not have been prepared but for the impending litigation.

Generally, a document is prepared in anticipation of litigation if it "can fairly be said to have been prepared or obtained because of the prospect of litigation, . . . (and not) in the regular course of business." *Pleasant Grove Missionary Baptist Church of Randolph Cty., Inc. v. State Farm Fire & Cas. Co.*, No. 4:11-CV-157 (CDL), 2012 WL 1997916, at *4 (M.D. Ga. June 4, 2012) (alteration in original) (quoting *Carver v. Allstate Ins. Co.*, 94 F.R.D. 131, 134 (S.D. Ga. 1982)); *see also Owens v. Stifel, Nicolaus & Co., Inc.*, No. 7:12-CV-144 (HL), 2013 WL 6389035, at *2 (M.D. Ga. Dec. 6, 2013). In this sense, Plaintiff's interpretation is correct. However, the courts have noted that this seemingly straightforward standard is complicated in the context of insurance disputes:

> [Insurance] claim files straddle both ends of this definition, because it is the ordinary course of business for an insurance company to investigate a claim with an eye toward litigation. Consequently, claim files generally do not constitute work product in the early stages of investigation, when the insurance company is primarily concerned with deciding whether to resist the claim, to reimburse the insured and seek subrogation . . . or to reimburse the insured and forget about the claim thereafter. Once litigation is imminent, however, the claims investigation file is maintained in anticipation of litigation and its contents are protected by the work product doctrine.

*Underwriters Ins. Co. v. Atlanta Gas Light Co.*, 248 F.R.D. 663, 667 (N.D. Ga. 2008) (internal citations omitted).

From this explanation, the true, objective determination is at what point litigation became "imminent" as opposed to merely possible or part of the abstract atmosphere.

7

Defendant contends that litigation became imminent on or around March 24, 2011, when Mr. Ramos conducted an independent investigation at Defendant's request, reviewed Plaintiff's and Defendant's engineering reports, and concluded that "he saw no evidence of hail during [the] inspection." [Doc. 25-1, p. 13, File Note dated 3/24/11 at 1:27 PM]. That is when, Defendant contends, Plaintiff and Defendant "reached a complete impasse on the issue of whether the roof had covered damage." [Doc. 25, pp. 14-15].

But in September or October of 2011, Defendant chose to reinspect the property at Plaintiff's insistence and, contrary to its previous position, chose to cover the damage to the roof. [Doc. 25, pp. 3-4; Doc. 25-1, p. 16, File Noted dated 10/10/11 at 7:21 AM; Doc. 25-7]. This is evidence that the disagreement between Plaintiff and Defendant regarding coverage was not, in fact, at an impasse. Rather, Defendant remained open to negotiation and responsive to Plaintiff's requests, which does not indicate the level of adversarial imminence that would warrant protection of documents.

After a thorough review of the record, the Court finds that the objective date at which it can be said that Defendant had a reasonable anticipation of litigation was January 12, 2012, when Plaintiff demanded an appraisal under the terms of the policy. [Doc. 25-11]. At that point, Plaintiff formally acknowledged that he wished to dispute the claim and informed Defendant that their joint efforts to resolve the claim were indeed at an impasse. From that point on, Plaintiff and Defendant became engaged in the adversarial process, whereas before that time, Defendant was "primarily concerned with

deciding whether to resist the claim, to reimburse the insured and seek subrogation . . . or to reimburse the insured and forget about the claim." *Underwriters*, *supra*. Thus, Plaintiff is entitled to discover all of Defendant's claims notes from before January 12, 2012, which are to be produced to Plaintiff by Defendant within seven days of this Order.[1]

    C.    **<u>Substantial Need and Undue Hardship</u>**

Having set the anticipation-of-litigation date at January 12, 2012, the Court now determines whether Plaintiff is entitled to any claims notes created after that date. Plaintiff is only entitled to those claims notes if it shows "that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

Defendant argues that, although Plaintiff may have substantial need for the claims notes, Plaintiff can obtain the information it seeks without undue hardship. Defendant avers that it provided Plaintiff with "the name of every employee who touched [Plaintiff's] claim," produced "nearly 7,000 pages of documents, including voluminous correspondence with the insured and others, as well as employment records of those who worked on the claim," and made its chosen appraiser and engineer available for depositions. [Doc. 25, p. 17]. Defendant further argues that Plaintiff should be able to find

---

[1] In its Privilege Log, Defendant objected to the production of claims notes made prior to January 12, 2012, only on the basis of the work-product doctrine and asserted no other privilege or confidentiality. [Doc. 28, pp. 2-4]. Given the Court's conclusion that these claims notes were not prepared in anticipation of litigation, Defendant is directed to produce them to Plaintiff, in their entirety and unredacted.

9

all the information it needs in this information as well as in the testimony of the 30(b)(6) deponents who have already been deposed.

In response, Plaintiff points to specific testimony from Mr. Ferunden, who was an integral figure in the resolution of the insurance claim at issue, in which he repeatedly states that he cannot recall most of the information surrounding Plaintiff's insurance claim. [Doc. 25-8]. Additionally, the *Underwriters* court noted that some courts view the need for claims notes in bad faith actions as inherently substantial:

> Bad faith actions against an insurer, like actions by client against attorney, or patient against doctor, can only be proved by showing exactly how the company processed the claim, how thoroughly it was considered and why the company took the action it did. The claims file is a unique, contemporaneously prepared history of the company's handling of the claim; in an action such as this the need for the information in the file is not only substantial, but overwhelming.

*Underwriters*, 248 F.R.D. at 668 (quoting *In re Bergeson*, 112 F.R.D. 692, 697 (D. Mont. 1986)). But the *Underwriters* court significantly hinged its decision to grant access to the claims file on the fact that the parties' coverage dispute had been resolved and the only claim remaining was the one for bad faith. *Id.* at 669 ("[B]ecause the underlying coverage dispute has been resolved, there is far less justification for protecting factual information in Underwriters' files.").

In this case, Plaintiff's need for information from the claims files is potentially substantial, and there is evidence that Plaintiff will suffer undue hardship in obtaining the information it needs, especially since key figures in the dispute cannot remember key

10

facts. *Cf. id.* ("Unlike in [other cases in this circuit], where the insured could obtain information through depositions, in this case the accuracy of certain deposition testimony is itself at issue (for example, Mr. Parrish's deposition contradicted his interview statement)."). However, the substantial need relates only to Plaintiff's bad faith claim, and not to its breach of contract claims. Thus, the Court **ORDERS** that this case be bifurcated pursuant to Federal Rule of Civil Procedure 42(b). *See Central Baptist Church of Albany Ga., Inc. v. Church Mutual Ins. Co.*, No. 1:16-CV-231 (LJA) (M.D. Ga. Dec. 5, 2017) (bifurcating insurance dispute into separate trials for the breach of contract and bad faith claims and withholding the claims file until resolution of the breach of contract claim). Upon the resolution of Plaintiff's breach of contract claims—and not before that time—the remaining claims notes will be redacted and presented to Plaintiff to assist in the prosecution of the bad faith claim.

## **CONCLUSION**

For the reasons stated herein, Defendant's Motion for Protective Order [Doc. 25] is **GRANTED IN PART**. The Court **ORDERS** Defendant to produce the claims notes created prior to January 12, 2012 to Plaintiff, unredacted and in full, within seven days of the date of this Order. The Court also **ORDERS** that Plaintiff's breach of contract claim be **SEVERED** from Plaintiff's bad faith claim such that the breach of contract claim is resolved first. Upon resolution of the breach of contract claim, the Court will address discovery and other matters related to the bad faith claim. All claims notes created after

11

January 12, 2012, were created in anticipation of litigation and shall not be made available to Plaintiff until the parties proceed on Plaintiff's bad faith claim. The Court's previous Order Staying Discovery [Doc. 24] is **LIFTED** as to Plaintiff's breach of contract claim.

**SO ORDERED**, this 1st day of October, 2018.

<u>**S/ Tilman E. Self, III**</u>
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**