## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

| | |
|---|---|
| OMNI HEALTH SOLUTIONS, LLC, | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| v. | **5:17-cv-00168-TES** |
| ZURICH AMERICAN INSURANCE COMPANY, | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court are Defendant's Motion for Summary Judgment [Doc. 35] and Amended Motion for Summary Judgment [Doc. 74]. For the reasons explained below, these motions are **GRANTED,** and Plaintiff is **ORDERED TO SHOW CAUSE** as to why Count III of the Complaint [Doc. 1-2] should not also be dismissed.

## FACTUAL BACKGROUND

In May of 2010, Plaintiff purchased an insurance policy from Defendant, whereby Defendant agreed to insure Plaintiff's medical office in downtown Macon, Georgia. [Doc. 1, ¶ 4]. On February 15, 2011, Plaintiff reported hail damage to the building's roof. [Doc. 35-8, ¶ 1]. Under the terms of the insurance policy, Defendant was obligated to "give notice of [its] intentions within 30 days" after receiving a sworn proof of loss from Plaintiff. [Doc. 1-2, p. 50]. The parties dispute what happened next.

Defendant claims that its adjuster, Michael Ferunden, inspected the property on February 16, 2011, two days after the alleged damage occurred. [Doc. 35-8, ¶ 2]. In a claims note prepared on February 17, Ferunden wrote that he inspected the lower level of the roof the previous day but did not attempt to inspect the upper portion because of its height and condition. [Doc. 35-7, p. 1]. Ferunden further noted that he advised Dr. Clyde Green, Plaintiff's managing partner, that he "did not see anything that appeared to be a storm created opening or any other storm damage." [*Id.* at p. 2]. Ferunden also told Dr. Green that he would "be happy to meet with [Plaintiff's] roofer to discuss and that [he] would schedule a time" to do so. [*Id.*].

Plaintiff, on the other hand, claims that, although Ferunden did visit the property within two days of when Dr. Green reported the damage, Ferunden was unable to gain access to the roof and did not actually inspect it until over a month later. [Doc. 38-3, ¶ 4]. Also, Dr. Green testified in his deposition that Ferunden did not visit the property within two days of the report of damage but instead made his initial visit "probably about twenty, thirty days after the initial call." [Doc. 35-5, pp. 18:12—19:7].

Although the parties disagree about when Defendant first denied coverage for Plaintiff's claim for roof damage, Defendant clocks the first denial of coverage on February 16, when Ferunden allegedly told Dr. Green that he saw no hail damage. Nonetheless, Plaintiff claims that a coverage decision did not occur until September 2011, after months of indecision and after Defendant denied Plaintiff's demand for an appraisal

in July 2011 because a coverage decision had not yet been made. [Doc. 38-3, ¶¶ 6, 7]. However, it is undisputed that Defendant informed Plaintiff of its position on March 28, 2011. [Doc. 35-8, ¶ 8].[1]

In September 2011, after months of dialogue and contention over the damage to the roof and property, Ferunden re-inspected the property and determined that there was covered damage to the roof. [*Id.* at ¶¶ 12, 13]. The parties then entered negotiations regarding the amount of the damage, a process that was also rife with disagreement. *See* [*id.* at ¶¶ 15–18, 21]. Dissatisfied with Defendant's assessment of the damage, Plaintiff ultimately demanded an appraisal of the loss under Section IV(B) of the policy, which states:

> **Appraisal** - If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire, A decision agreed to by any two will be binding. Each party will:
> 1.    Pay its chosen appraiser; and
> 2.    Bear the other expenses of the appraisal and umpire equally.
> If there is an appraisal, we will still retain our right to deny the claim.

---

[1] Although Plaintiff nominally disputes this fact, Plaintiff does not controvert it with a specific reference to facts in the record as required by Local Rule 56. *See* LR 56, MDGa ("Response shall be made to each of the movant's numbered facts. All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."). Plaintiff's response to this fact merely states, "See response to 7, above," which refers to a citation that is irrelevant to this fact.

[Doc. 1-2, p. 48]; [Doc. 25-11].

After a controversial appraisal process, the appraisal panel—consisting of the umpire Michael Wasden, Defendant's chosen appraiser R. William Corley, and Plaintiff's chosen appraiser Chris Cole—issued a structural damage award in the amount of $886,795.57 in replacement cost value ("RCV") and $804,295.98 in actual cash value ("ACV").[2] [Doc. 25-14, p. 1]; [Doc. 38-4, p. 6]. The award was ultimately signed by all three appraisers and upheld by the Georgia Court of Appeals. [*Id.*]; [Doc. 38-8, pp. 5–6]. The panel made an accounting of the amount awarded for code improvements ($115,116.43) and listed it separately at the bottom of the total award. [Doc. 25-14, p. 1]. The panel also made a separate accounting of mold remediation ($222,307.92) at the bottom of the total award. [*Id.*]. Corley specifically requested that the amounts for code upgrades and mold remediation be listed separately on the face of the award but later explained that the awards were included in the RCV and ACV totals and stated separately only for convenience. [Doc. 39-2, pp. 90:6—92:2]. Wasden agreed that the code upgrade and mold remediation amounts were not intended to be added to the total RCV and ACV awards and confirmed that they were listed separately for clarification. [Doc. 41-1, ¶ 5]. Contrary to Corley and Wasden's understanding, Plaintiff's chosen appraiser, Chris Cole, testified that the code improvement and mold remediation amounts were

---

[2] The difference between RCV and ACV is the depreciation in the property attributable to the loss. *See* [Doc. 35-1, p. 14 n.1]. Defendant was obligated to pay Plaintiff the RCV if Plaintiff chose to make repairs to the property or the ACV if Plaintiff chose not to repair the property.

additional awards to be made in excess of the RCV and ACV. [Doc. 35-6, pp. 69:19—70:20, 73:7–11].

Prior to the panel issuing the appraisal award, Defendant paid $398,936.56 in partial satisfaction of its obligations under the policy. [Doc. 35-8, ¶ 46]. After the panel issued the award, Defendant paid an additional $519,948.20 to satisfy the remainder owed under the award plus excess expenses. [*Id.* at ¶¶ 51, 53]. Under the terms of the insurance policy, Defendant agreed to insure the replacement cost of the building up to $2.7 million and the cost of "building ordinance[s] or law[s]" up to $50,000. [Doc. 1-2, p. 30]. Accordingly, Defendant deducted $65,116.43 from the $115,116.43 code upgrade portion of the award as exceeding the $50,000 policy limit for code improvements. [*Id.* at ¶ 50]. On October 19, 2016, Defendant informed Plaintiff that it had satisfied its obligations under the policy and closed Plaintiff's claim. [*Id.* at ¶ 43].

Thereafter, Plaintiff filed this lawsuit, claiming that Defendant breached the insurance policy by (1) failing to make a coverage decision within 30 days of receiving Plaintiff's proof of loss; (2) failing to pay to total amount owed to Plaintiff under the policy and the appraisal award; and (3) failing to assess the property's diminution in value. [Doc. 1-2, Counts I and II]; [Doc. 18]. Plaintiff also claims that Defendant acted in bad faith in failing to comply with the terms of the policy. [Doc. 1-2, Count III]. The Court bifurcated Plaintiff's breach of contract claims from its bad faith claim, [Doc. 29], and

Defendant now moves for summary judgment on the breach of contract claims. For the reasons that follow, the Court **GRANTS** summary judgment to Defendant.

**DISCUSSION**

### A.    Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present *affirmative evidence* to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17) (emphasis added). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

**B.     Count I: Failure to Make a Coverage Decision within 30 Days**

In Count I, Plaintiff charges Defendant with breaching the insurance policy by failing to make a coverage decision within 30 days of Plaintiff reporting the damage to the roof. Although Defendant initially addressed this claim on the merits in its brief in support of its original motion for summary judgment, it raised the argument that all of Plaintiff's claims are barred by the two-year limitations period contained in the policy for the first time at the hearing on its motion. The clause states:

> **Legal Action against Us** - No one may bring a legal action against us under this Coverage Part unless:
> 1.     There has been full compliance with all of the terms of this Coverage Part; and
> 2.     The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

[Doc. 1-2, p. 53].

The Court ordered the parties to brief the issue, and Plaintiff raised two arguments in response to Defendant's reliance on the policy limitations period. First, Plaintiff argues

that Defendant waived this defense by failing to plead the statute of limitations as a defense in its answer as required by Federal Rule of Civil Procedure 8(c). Second, Plaintiff contends that its invocation of the appraisal process tolled the limitations period, making its claims timely. Having reviewed the parties' supplemental briefs, the Court now concludes that Count I is time-barred.

1.    Defendant's Failure to Plead a Statute of Limitations Defense

Georgia courts recognize that filing suit within the time allotted by the terms of an insurance policy is a condition precedent to recovery on the policy rather than an issue resolved with reference to statute of limitations jurisprudence. *See Willis v. Allstate Ins.*, 779 S.E.2d 744, 746 (Ga. Ct. App. 2015); *see also Suggs v. Brotherhood of Locomotive Firemen and Enginemen*, 121 S.E.2d 661, 665 (Ga. Ct. App. 1961) ("A defense based upon a contractual limitation as to the time in which an action may be filed differs from a defense based upon a statutory limitation of actions, in that the former may be raised by a general demurrer whenever the petition affirmatively shows the action to have been brought after the expiration of the time stated in the contractual limitation, while in the latter case a general demurrer must specify the statute of limitations as a ground."), *overruled in part on other grounds by Benefield v. Malone*, 139 S.E.2d 500 (Ga. Ct. App. 1964). As such, Federal Rule of Civil Procedure 8(c), which requires that an affirmative defense relating to a plaintiff's noncompliance with a statute of limitations be pled in an answer, is not applicable here.

On the contrary, the pleading requirements for failure to comply with conditions precedent to suit—including failure to sue within a contractual limitations period—are found in Rule 9(c). Rule 9(c) requires that plaintiffs plead compliance with conditions precedent to suit and allows them to do so generally. Fed. R. Civ. P. 9(c). But where a defendant denies that a plaintiff complied with the conditions precedent to suit, he must plead that denial with particularity. *Id.* Nevertheless, a defendant who fails to properly comply with Rule 9(c) in his answer can still raise a specific denial of the performance of conditions precedent in a motion. *See Associated Mech. Contractors, Inc. v. Martin K. Eby Constr. Co.*, 271 F.3d 1309, 1317 (11th Cir. 2001) (holding that defendant's failure to plead denial of plaintiff's performance of conditions precedent with particularity in his answer was cured by his specific articulation of the denial in his motion for summary judgment and supporting brief).

Here, Plaintiff generally alleged that it complied with the conditions precedent to its breach of contract claim, and Defendant denied the allegations generally. *See* [Doc. 1-2, ¶¶ 18, 21]; [Doc. 1-3, ¶ 18, 21]; [Doc. 18, ¶ 26]; [Doc. 19, ¶ 26]. Defendant's subsequent amendment to its motion for summary judgment, which specifically raised the issue of whether Plaintiff complied with the contractual limitations period in the insurance policy, cured the defect in its answer and preserved the defense.

2.      Tolling for the Appraisal Process

The parties do not dispute that Plaintiff filed the instant lawsuit six years, one month, and two weeks after the alleged hail damage to its building. Nevertheless, Plaintiff argues that the three-and-a-half-year appraisal process tolled all but 21 months of the two-year contractual limitations period, rendering its claims timely.

Plaintiff is correct that the appraisal process generally tolls an insurance policy's limitations period. *See Peeples v. Western Fire Ins.*, 99 S.E.2d 349, 351–52 (Ga. Ct. App. 1957). For the purposes of this rule, the appraisal process includes the actual work done by the panel and any subsequent pendency of an action challenging an award. *See National Union Fire Ins. v. Ozburn*, 194 S.E. 756, 758–59 (Ga. Ct. App. 1937). What is unclear is whether all claims related to an insurance policy are tolled by the appraisal process or only those that are affected by or dependent upon the outcome of the appraisal.

It appears that this tolling doctrine arose from *Insurance Co. of North America v. Folds*, 135 S.E. 107 (Ga. Ct. App. 1926), in which the court essentially ruled that where an insurer and insured agree to enter the appraisal process to determine the amount of a loss, a lawsuit relating to the insured's liability under the policy cannot be maintained until the appraisal process is complete because the award—which constitutes the amount of damages in a suit on the policy—has not been set by the appraisal panel. 135 S.E. at 108. That is, the appraisal process, once entered into by both the insurer and insured, tolls the contractual limitations period in cases where damages are contractually equal to the

amount of the appraisal award. This makes sense because a breach of contract action cannot be maintained without proof of non-speculative damages, and the appraisal process is intended to set the amount of damages in an insurance dispute contractually. *See McCumbers v. Westside Assocs.*, 447 S.E.2d 331, 332 (Ga. Ct. App. 1994) ("[D]amages must be capable of estimation to a reasonable certainty."); *Southern Gen. Ins. v. Kent*, 370 S.E.2d 663, 664 (Ga. Ct. App. 1988) ("An appraisement award is the result of a contractual method of ascertaining the amount of loss, and it is binding on the parties as to the amount of loss unless the award is set aside.").

Count I of Plaintiff's complaint is based on extra-contractual damages; it is not based on whether Defendant is required to cover the property's alleged loss. Thus, the measure of damages is not the loss attributable to a covered damage, as calculated by the appraisal panel, but some other amount that Plaintiff incurred as a result of Defendant's actions. As such, the appraisal process did not toll this claim. In the absence of some tolling provision, Plaintiff was required to bring suit on Defendant's alleged failure to make a timely coverage decision by February 14, 2013. Plaintiff did not file suit until March 28, 2017. [Doc. 1-2]. Count I is therefore time-barred, and Defendant's motion for summary judgment on this claim is **GRANTED**.[3]

---

[3] Counts II and IV raise unique limitations issues. It is likely that Count II, in which Plaintiff alleges that Defendant failed to pay the entirety of the appraisal award, was tolled by the appraisal process but did not become ripe until Defendant's alleged nonpayment. Likewise, Count IV, in which Plaintiff alleges that Defendant failed to assess and pay the diminished value of the property, was likely not tolled by the appraisal process (because damages were not determined by appraisal) but probably did not become ripe until the Georgia Supreme Court announced the right to a payment for the diminished value of real

**C.**    **Count II: Failure to Pay Entirety of Appraisal Award**

Plaintiff takes issue with two aspects of Defendant's payment of the structural-damage appraisal award. First, Plaintiff claims that the code upgrade and mold remediation awards, which were separately stated on the cover page to the award, were intended to be amounts due in excess of the RCV, for a total award of $1,224,219.92. As such, Plaintiff contends that Defendant breached the policy by paying Plaintiff only $918,884.76. The Court construes Plaintiff's argument to suggest that the appraisal award is ambiguous as to whether the RCV includes the separately-stated code upgrade and mold remediation amounts and that the ambiguity is one that cannot be resolved as a matter of law. Second, Plaintiff claims that Defendant was not entitled to subtract amounts paid prior to the entry of the award from the overall award or to cap payments at the policy limits. The Court considers these two arguments in turn.

**1.**    Code Upgrade and Mold Remediation Awards

Under Georgia law, appraisal awards are contractual in nature and can be attacked for the same reasons an ordinary contract can be attacked. *See, e.g., Jordan v. General Ins. Co. of Am.*, 88 S.E.2d 198, 200–01 (Ga. Ct. App. 1955). The question of a contract's ambiguity is one for the Court, and it only becomes a question for a jury if the Court cannot resolve the ambiguity through the ordinary principles of contract construction.

---

property in 2012. *See Royal Capital II, infra*. Because the law is not clear in regard to these issues, the Court assesses the sufficiency of Counts II and IV based on the grounds raised in Defendant's original motion for summary judgment.

*Stern's Gallery of Gifts, Inc. v. Corporate Prop. Inv'rs, Inc.*, 337 S.E.2d 29, 36 (Ga. Ct. App. 1985). In determining whether a contract contains an ambiguity, the Court must ascertain the intent of the parties by first looking to the entirety of the contract and deferring to a reading of the contract that upholds it in its entirety. *Municipal Elec. Author. of Ga. v. Gold-Arrow Farms, Inc.*, 625 S.E.2d 57, 61 (Ga. Ct. App. 2005). If the terms are "plain . . . and capable of only one reasonable interpretation," there is no ambiguity, and the Court will not look to parol evidence to interpret them. *Id.* (quoting *Wolverine Ins. v. Jack Jordan, Inc.*, 99 S.E.2d 95, 97–98 (Ga. 1957)). But where there is an ambiguity, the Court "may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent." *Id.* (quoting *Southern Fed. Sav. & Loan Ass'n of Atlanta v. Lyle*, 290 S.E.2d 455, 458 (Ga. 1982)).

In this case, there is no ambiguity. There are two versions of the appraisal award in the record. The first version contains the cover page Plaintiff argues is ambiguous. *See* [Doc. 25-14].[4] The second version does not have the cover page but contains a full, 114-page accounting of the structural damage award, portions of which are attached to the first version of the award. *See* [Doc. 39-6]. In the second version, it is clear that the amount awarded for code upgrades equaled $93,681.99—$40,707.00 of which was included in the mold remediation total, $19,831.87 of which was included in the Exterior/General total,

---

[4] The cover page was later signed by Plaintiff's chosen appraiser, Chris Cole. *See* [Doc. 38-4, p. 6].

and $33,143.12 of which was included in the Roof total. [*Id.* at pp. 3, 109–11].[5] These amounts are reflected in the "Line Item Total" amount on page 112, which is used as the base for calculating the total RCV and ACV. [*Id.* at p. 112]. Common sense dictates that these numbers would not be included in RCV and ACV and then added again to those totals to reach the total amount of the loss. The only reasonable interpretation of the award is that the code upgrades and mold remediation amounts listed on the cover page of [Doc. 25-14] were already included in the total award amount and listed separately for clarification purposes. Although perhaps mathematically confusing, the appraisal award is not ambiguous, and there is no question of fact to be determined by a jury.[6]

### 2. Prior Payments and Policy Limits

Second, Plaintiff claims that Defendant was not entitled to deduct prior payments from the structural damage award or to cap code upgrade payments at the policy limit. As to prior payments, Plaintiff's claim is controlled by the principle that plaintiffs are generally not entitled to double recovery. *See, e.g., Candler Hosp., Inc. v. Dent*, 491 S.E.2d

---

[5] After checking the math, the Court determined that the amount awarded under the mold remediation subheading at the top of page 111 ($181,597.92), plus the amounts awarded for electrical, fire protection, plumbing, and elevator code upgrades ($40,707.00), equals the amount listed beside "Total: Mold Remediation" in the middle of page 111 and the amount noted on the allegedly ambiguous cover page of the award ($222,307.92). *Compare* [Doc. 25-14, p. 1] *with* [Doc. 39-6, p. 111].

[6] However even if the cover page were ambiguous, parol evidence supports the Court's conclusion. Michael Wasden and R. William Corley, the umpire and appraiser who initially signed the award cover page and made it binding on the parties, explained that the separately-stated awards were intended for clarification purposes. [Doc. 39-2, pp. 90:5—92:2]; [Doc. 41-1, ¶ 5]. Indeed, Corley also testified that the inclusion of the separately-stated items in the total RCV and ACV can be ascertained from looking at the 114-page version of the award. [Doc. 39-2, pp. 91:22—92:2].

868, 869 (Ga. Ct. App. 1997) ("Georgia, as part of its common law and public policy, has always prohibited a plaintiff from a double recovery of damages; the plaintiff is entitled to only one recovery and satisfaction of damages, because such recovery and satisfaction is deemed to make the plaintiff whole."). The record evidence establishes that the appraisers intended Defendant to deduct prior payments from the overall award and, having no access to information regarding prior payments, trusted Defendant to accurately account for those prior payments. *See* [Doc. 35-6, pp. 106:18—108:2, 110:11—111:19, 126:13—127:2]; [Doc. 38-4, ¶ 10].

Plaintiff's only "evidence" to the contrary is the declaration of Chris Cole, Plaintiff's chosen appraiser, who—after testifying that he understood that Defendant would deduct prior payments from the appraisal award[7]—speculates that "it is possible

---

[7]  Q:   . . . It was your understanding that once the award was entered . . . that the amounts that had already been paid to repair the structural damage would be subtracted from that total? That was the understanding you were operating under?
A:   Yes.
Q:   And you operated under that assumption throughout the entirety of the [appraisal] process?
A:   Yes. It's actually very common.

[Doc. 35-6, pp. 107:15—108:2].

[The appraisal award] is intended to include the totality of the loss. Oftentimes when a claim reaches an impasse and goes to appraisal, some payments have been paid. Without—and you could do what's called a new cash appraisal if you knew exactly what the previous payments were and what they were for exactly. But most appraisals are simply net loss appraisal. And then, you know, obviously previous payments that are included in the appraisal award would be deducted so the insurer doesn't pay twice.

[*Id.* at pp. 126:18—127:2].

that [Defendant] has subtracted amounts previously paid that were not represented in the award, thus paying benefits and then deducting them inappropriately." [Doc. 38-4, ¶ 12]. Such speculation is insufficient to create a genuine issue of material fact on summary judgment. *See* Fed. R. Civ. P. 56(c) (requiring that declarations be made on personal knowledge and contain facts that would be admissible in evidence); *see also Gerard v. Board of Regents of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009) ("Speculation or conjecture from a party cannot create a genuine issue of material fact."); *Gunn v. Target Corp.*, No. 5:03-CV-0357-VEH, 2006 WL 8436916, at *1(D) (N.D. Ala. Jan. 26, 2006) ("A party's mere 'belief' and/or speculation is not based on personal knowledge and is not competent summary judgment evidence."). In the absence of evidence to establish that Defendant deducted amounts that had not been previously paid, there is no issue of fact as to whether Defendant was entitled to deduct previous payments and thereby avoid Plaintiff's double recovery.

Defendant also deducted $65,116.43 from the $115,116.43 code upgrade portion of the award because it exceeded the $50,000 policy limit for code improvements, and Plaintiff claims this was improper. Plaintiff points to no authority that requires an insurer to pay the insured more than the contracted limits. The insurance policy specifically informs Plaintiff that Defendant will pay no more than "the applicable Limit of Insurance for each coverage shown in the Declarations," except in certain circumstances that also do not apply here. [Doc. 1-2, p. 48]. Moreover, the record evidence establishes that the

appraisers understood that Defendant would apply the policy limits to the appraisal award. *See* [Doc. 35-6, pp. 69:19—71:17, 74:4—19, 120:25—121:8].[8] There is no issue of fact as to whether Defendant was required to pay the entirety of the appraisal award, including amounts that exceeded the applicable policy limits, and Defendant is entitled to summary judgment as a matter of law.

### D.   Count IV: Failure to Assess Diminution of Value

Finally, Plaintiff alleges that Defendant breached the insurance policy by failing to assess diminution in the building's value and failing to pay any such diminution. In 2001, the Georgia Supreme Court consolidated prior case law to make the determination that automobile insurers are required to make insureds whole by paying the difference in value of a damaged vehicle, even when the insurer elects to repair the vehicle. *State Farm Mut. Auto. Ins. v. Mabry*, 556 S.E.2d 114, 122 (Ga. 2001) ("[T]he insurance policy, drafted

---

[8]    [T]he award is properly framed so that each coverage can be properly applied. So you'd have coverage A, the building. And then you [have] a[n] additional coverage for code upgrades. And then you have in many policies an additional coverage or sub-limit for mold remediation. And so then it would be proper to frame the award with those things separate, so that the insurance company can properly apply coverage. We're [i.e., the appraisal panel] not applying coverage. We're simply framing the award so that coverage can be applied.

[Doc. 35-6, p. 74:9—19].

> Q:     . . . it was your understanding that any caps on recovery for a particular type of damage were not to be included in the award; correct?
> A:     That's correct.
> Q:     And so if there was such a cap, it would be up to the insurance company to apply that post-award; is that correct?
> A:     That's correct.

[*Id*. at pp. 107:15—108:2].

by the insurer, promises to pay for the insured's loss; what is lost when physical damage occurs is both utility and value; therefore, the insurer's obligation to pay for the loss includes paying for any lost value."). In *Mabry*, the plaintiffs argued that the insurance company was required to compensate them for the value that their vehicle lost by sheer virtue of having been involved in an accident. *Id.* at 116. The Georgia Supreme Court agreed, and in doing so, reiterated the principle that whatever is given to an insured in satisfaction of his or her claim must equal the market value of the property before it was damaged, and the insurer can repair the property and pay its diminished value or pay the full, pre-damage market value in cash. *Id.* at 120. Either way, "the measure of damages is based on value," not condition. *Id.*

Ten years later, the Eleventh Circuit Court of Appeals asked the Georgia Supreme Court to clarify whether its decision in *Mabry* extends to all forms of insurance coverage— particularly buildings—and not merely automobile insurance. *Royal Capital Dev., LLC v. Maryland Cas. Co.* (*Royal Capital I*), 659 F.3d 1050 (11th Cir. 2011). The Georgia Supreme Court confirmed that it did. *Royal Capital Dev., LLC v. Maryland Cas. Co.* (*Royal Capital II*), 728 S.E.2d 234, 238 (Ga. 2012).

Despite this precedent, Defendant argues that it is entitled to summary judgment on Plaintiff's diminution in value claim because (1) the policy does not provide for the payment of diminished value, and (2) Plaintiff cannot prove that the damage to its property caused the building's value to diminish. Although the Court disagrees with

Defendant's argument that diminution in value is not covered by the policy, it agrees that Plaintiff cannot prove damages and therefore grants summary judgment to Defendant on this claim.

1.    The Policy

In *Royal Capital II*, the Georgia Supreme Court explained that "whether damages for diminution of value are recoverable under [an insurance policy] depends on the specific language of the contract itself and can be resolved through application of the general rules of contract construction." *Id.* The insurance policy at issue there provided coverage for "direct physical loss of or damage to" a building and required the insurer to pay either "the value of lost or damaged property" or "the cost of repairing or replacing the lost or damaged property." *Royal Capital I*, 659 F.3d at 1051–52. The Georgia Supreme Court specifically indicated that the contract required the insurer to repair the property and also pay its diminished value, if any. *Royal Capital II*, 728 S.E.2d at 238.

The language of the policy at issue in this case is nearly identical to that in *Royal Capital I.* It states, "In the event of loss or damage covered by this Coverage Part, at our option we will either: a. Pay the value of lost or damaged property; [or] b. Pay the cost of repairing or replacing the lost or damaged property." [Doc. 1-2, p. 50]. This being practically indistinguishable from the language of the policy in *Royal Capital I*, the Court cannot agree with Defendant that diminution in value is not covered by the policy. The amount of this loss is made up of lost utility and value, *see Mabry*, 556 S.E.2d at 508, and

by repairing Plaintiff's building, Defendant compensated Plaintiff for the loss in utility, but was also required to pay for the loss in value. *Cf. Thompson v. State Farm Fire & Cas. Co.*, 264 F. Supp. 3d 1302, 1309–10 (M.D. Ga. 2017); *Anderson v. American Family Ins.*, No. 5:15-CV-475 (MTT), 2016 WL 3633349, at *3–5 (M.D. Ga. June 29, 2016).

The Court also disagrees with Defendant's argument that Plaintiff bore the burden of requesting an assessment of diminution of value during the appraisal process. Under the terms of the policy, the obligation to assess the value of a loss rests with Defendant. *See* [Doc. 1-2, pp. 51–52 ("Valuation")]. And although *Royal Capital II* was decided during the pendency of the appraisal process, Defendant, as a sophisticated party presumed to know and be up-to-date on the law, was obligated to ensure that the appraisal process comported with prevailing insurance law. Thus, the Court disagrees with Defendants arguments that *Mabry* and *Royal Capital II* do not apply to this case and that Defendant had no obligation to assess diminution in value.

2. Damages

Notwithstanding the above determination, the Court agrees with Defendant that Plaintiff cannot prove its damages. At a hearing on these issues, Plaintiff stated that it intended to offer the testimony of Dr. Clyde Green, Plaintiff's managing partner, to prove the existence and amount of the diminished value of the property. Plaintiff contends that under Georgia law, a property owner may testify about the property's value as long as he establishes his "knowledge, experience or familiarity with the value of improvements

or real estate generally or of those values in the vicinity in particular." [Doc. 38, p. 11 (quoting *Dep't of Transp. v. Into*, 464 S.E.2d 886, 887 (Ga. Ct. App. 1995))]. Plaintiff further contends that Dr. Green has such knowledge and is therefore competent to testify.

In response, Defendant correctly points out that the rules of evidence, including those applicable to the testimony of lay and expert witnesses, are controlled by federal law in cases before the Court under diversity jurisdiction. *Moore v. GEICO Gen. Ins.*, ___ F. App'x ___, 2018 WL 6602094, at *4 n.7 (11th Cir. Dec. 14, 2018) (quoting *ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1299 (11th Cir. 2018)). Defendant further argues that Dr. Green is not qualified to testify as an expert witness under Federal Rule of Evidence 702 regarding the diminution in value Plaintiff's building allegedly underwent and that Plaintiff's failure to offer a timely expert disclosure for Dr. Green precludes Plaintiff from relying on his testimony. The parties dispute whether Dr. Green's proffered testimony is that of an expert or a lay witness and whether such testimony, in either capacity, is admissible.

The Federal Rules of Evidence warn courts to be vigilant of parties' attempts to evade the expert witness requirements by "calling an expert witness in the guise of a layperson." Fed. R. Evid. 701 advisory committee's notes to 2000 amendment. Thus, in order to give full effect to the spirit of the Rules, the Court is tasked with first determining whether Dr. Green's testimony about the diminution in Plaintiff's building is being offered as expert testimony or lay testimony.

The District Court for the Northern District of Alabama recently undertook an extensive analysis of the interplay between Federal Rules of Evidence 701 and 702 when a property owner seeks to testify about the value of his property. *See United States v. An Easement & Right-of-way over 6.09 Acres of Land*, 140 F. Supp. 3d 1218, 1239–43 (N.D. Ala. 2015). In doing so, the court explained that many courts, including some in this circuit, recognize that a property owner's testimony about the value of his property is generally acceptable, unless it strays into the realm of expert testimony. *Id.* Whether a property owner's testimony constitutes expert or lay opinion testimony depends on whether it is based on "commonly understood considerations of worth flowing from his perceptions and knowledge of his property" or on "technical or specialized knowledge more broadly." *Id.* at 1242. The former falls under the purview of the lay witness requirements of Federal Rule of Evidence 701, while the latter is governed by the expert witness requirements of Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

But diminution in value, by its very nature and as opposed to a stagnant, moment-in-time value of property, requires knowledge of the value of property but also some specialized knowledge of the effects certain kinds of damages and repairs have on the *change* in that value. That is, diminution in value requires proof of some causal connection between the damages and repairs a piece of property undergoes and the net decrease in a property's value solely attributable to those damages and repairs. *See Mabry*, 556 S.E.2d

at 505 (defining diminution in value when repairs have been completed to be "the difference between pre-loss value and post-repair value").

Having reviewed the matter, the Court concludes that Dr. Green seeks to proffer expert testimony about the decrease in the value of Plaintiff's property because of the repairs it underwent and that he is unqualified to do so. In his deposition, Dr. Green testified that he believed the value of the building diminished by $500,000.00. [Doc. 35-5, pp. 83:1—84:10]. He reached this number on his own after considering mailers from real estate agents regarding property sales in the area and the tax appreciation of other buildings. [*Id.*]. Dr. Green further declared that his testimony regarding the building's diminished value would be based on his

> knowledge of the building, the nature of the damage to the building, the resulting mold infestation in the building, the stigma likely to attach to buildings that have endured the extent and duration of the damage that [Plaintiff's] building has endured, and the commercial real estate market in the Macon metropolitan area, including sales prices of comparable properties that have not suffered the damage that [Plaintiff's] building has suffered.

[Doc. 38-3, ¶ 12].

This testimony is expert in nature because it requires a specialized understanding of the effect of market factors and specific types of damage (e.g., water intrusion and mold) on commercial real property in the area and of what constitutes "comparable property." *See* Fed. R. Evid. 701(c). In this instance, Dr. Green, as the owner of the damaged building, based his opinion on facts that an expert would ordinarily use to reach

a valuation of property, rather than relying on his own perceptions and understanding of his property. *See 6.09 Acres of Land*, 140 F. Supp. 3d at 1243 (quoting *Bankr. Evid. Manual* § 701:2 (2014 ed.)) ("If testifying under 701, the owner may merely give his opinion based on his personal familiarity of the property, often based to a great extent on what he paid for the property. On the other hand, if he is truly an expert qualified under the terms of Rule 702 by knowledge, skill, experience, training or education . . . then he may also rely on and testify as to facts of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject . . . pursuant to Rule 703."); *see also* Tom Lacy & Randy Edwards, *Diminished Value Claims, Not Just for Cars Anymore*, The Verdict, Spring 2016, at 34, 36.[9]

---

[9] In diminution cases, experts usually use

the market approach, where sales or listings of comparable properties are used to calculate a value of the subject property. Usually, the three most important factors in appraisal are '*location, location* and *location*.' However, these rules go out the window when appraising a contaminated property. The appraiser must locate properties that have sold or are on the market with the same or similar type of stigma.

In simple terms, the appraiser will have to appraise at least two properties, the subject property and one or more comparison properties ["comps"] with a documented history of the same or similar type of contamination. Unless there is neighborhood-wide contamination, this will likely require using comparison properties farther away from the subject property than would normally be used. In addition, the comps will likely have more differences in size, finishes and features as well. All will involve calculating the hypothetical value with no impairment. The hypothetical value will be considered the "baseline." Dividing the actual sales or listing price of the comparisons by their baselines will yield a percent "stigma factor." Multiplying the stigma factor by the baseline of the subject property will yield the diminution in value of the subject property.

Stigma is not a constant factor, meaning it may increase or decrease over time. For example, while a recently remediated house with a recent documented history of mold may have a stigma factor of 25 percent, several years later, assuming the remediation was successful and no further mold exposures, that same house may have a stigma factor of just 5-10 percent. Conversely, if the mold continues or worsens, the stigma factor may rise to 50 percent or more. However, the measure of damages is the difference in value

In order to give such testimony, Dr. Green must have the requisite "scientific, technical, or other specialized knowledge" befitting an expert in the field and must base his opinion on "sufficient facts or data." Fed. R. Evid. 702(a), (b). It is undisputed that Dr. Green is not an expert in property valuation; rather, he is a physician. There is also no evidence that Dr. Green has any training, experience, or specialized knowledge in commercial property valuation, sales, or repairs. It is also undisputed that Dr. Green did not provide any admissible, factual basis for his opinion that Plaintiff's property value diminished by $500,000.00 because of the damage it incurred. Accordingly, Dr. Green is not qualified to testify at trial about diminution in value,[10] and in the absence of other expert testimony, Plaintiff is incapable of proving damages.

Furthermore, Plaintiff's determination of damages is speculative and insufficient to withstand summary judgment. *See McCumbers*, 447 S.E.2d at 332 ("Although the rule against the recovery of speculative damages relates more to the uncertainty of the cause, rather than the measure or extent of the damages, damages must be capable of estimation to a reasonable certainty."); *see also 6.09 Acres of Land*, 140 F. Supp. 3d at 1243 (quoting

---

immediately before and after the loss. Thus, the fact that the stigma factor may decrease (or increase) over time, should be irrelevant in calculating diminution in value immediately following the loss.

Tom Lacy & Randy Edwards, *Diminished Value Claims, Not Just for Cars Anymore*, The Verdict, Spring 2016, at 34, 36. To the extent Dr. Green, a physician by training, based his declaration and the $500,000.00 diminution amount on some form of this analysis, he is unqualified to make this assessment.

[10] Defendant's Motion in Limine to Exclude the Testimony of Dr. Clyde Green [Doc. 46] is **GRANTED**.

*United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966)) ("Qualified and knowledgeable witnesses may give their opinion or estimate of the value of the property taken, but to have probative value, that opinion or estimate must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption. It must have a rational foundation."). Dr. Green did not issue an expert report, and there is no evidence in the record from which a jury could estimate that the building diminished in value by $500,000.00 as a result of the damage it suffered. Therefore, Defendant's motion for summary judgment on this claim is **GRANTED**.

E.    Count III: Bad Faith

The Court previously bifurcated this case and ordered the parties to proceed with dispositive motions on Plaintiff's breach of contract claims, leaving the resolution of Plaintiff's bad faith claims for another day. However, in light of the rulings made above, the Court has serious concerns that the bad faith claim will be unable to survive. In Count III, Plaintiff alleges that Defendant's "unjustified and unreasonable failure to comply with the terms of its own policy constitutes bad faith and a knowing renunciation of its policy obligations" and seeks to hold Defendant liable for exemplary damages under Ga. Code Ann. § 33-4-6. In the demand letter Plaintiff was required to send Defendant under the statute, Plaintiff elaborated on the bases for the bad faith claim. *See* [Doc. 39-7]. Plaintiff contends that Defendant acted in bad faith in failing to make a timely coverage decision and in failing to pay the entirety of the appraisal award.

First, the Court is not convinced that Ga. Code Ann. § 33-4-6 entitles Plaintiff to recovery for damages arising from Defendant's alleged untimely coverage decision. It appears that the statute applies only to claims relating to the existence of a covered loss and the insurer's refusal to pay for such loss, as opposed to *any* breach of the policy. *See* Ga. Code Ann. § 33-4-6(a) ("In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same . . . and a finding that such refusal was in bad faith, the insurer shall be liable to pay [the] [policy]holder . . . ."). But even if the statute were to impose penalties for any breach made in bad faith, it seems logical that a bad-faith claim based on the time-barred allegations in Count I would also be time-barred for the same reasons as Count I. *See Kent*, 370 S.E.2d at 665 (bad faith claims under Ga. Code Ann. § 33-4-6 are tolled by the appraisal process in the same way breach of contract claims are); *see* Section B, *supra*.

Second, to the extent to bad faith claim is a derivative of Plaintiff's claim that Defendant breached the insurance policy by failing to pay the entirety of the appraisal award, the Court is unsure of how such a claim can exist in the absence of a breach. *See* Section C, *supra*. The Court has determined that Defendant did not refuse to pay for the loss, and it follows that there can be no bad faith claim under the statute in the absence of a refusal to pay.

In light of these concerns, the Court **ORDERS** Plaintiff to show cause within 21 days of the date of this Order as to why summary judgment should not be granted to

Defendant on Count III. *See* Fed. R. Civ. P. 56(f). Upon request, Defendant shall have seven days to rebut Plaintiff's response to this Order.

## CONCLUSION

As explained above, the Court **GRANTS** Defendant's Motions for Summary Judgment [Docs. 35, 74] and **ORDERS** Plaintiff to show cause within 21 days as to why the Court should not also dismiss Count III. Defendant's Motion in Limine to Exclude the Testimony of Dr. Clyde Green [Doc. 46] is **GRANTED**. Defendant's Motion in Limine to Exclude the Testimony of Chris Cole [Doc. 48] and Plaintiff's Motion in Limine to Exclude the Testimonies of Bill Corley and Raymond Ramos [Doc. 53] are **DENIED as moot**.

**SO ORDERED**, this 18th day of April, 2019.

**s/Tilman E. Self, III**
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**